UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------X
Frances Monteleone, Linda Rodriguez,
Elyse Scileppi, Frank J. Monteleone, and      CV-08-1986(CPS)(SMG)
Wendy Monteleone,

                        Plaintiffs,           MEMORANDUM
                                              OPINION AND ORDER

          - against -


The Leverage Group, Leverage Option
Management Co., Inc., North American
Financial, Philip Barry LLC, and Philip
Barry,
                        Defendants.
----------------------------------------X
Margaret Schaefer Barglow, Raymond
Barglow, Pamela Montanaro, Siri Scull,        CV-08-2131(CPS)(SMG)
Charles Scull, Robert Wolfson, and Mahalia
Pugatch,

                        Plaintiffs,


          - against -


The Leverage Group, Leverage Option
Management Co., Inc., North American
Financial, Philip Barry LLC, and Philip
Barry,
                        Defendants.
----------------------------------------X
Gene Bianco and Anita Bianco,
                                              CV-08-3033(CPS)(SMG)

                        Plaintiffs,


          - against -


The Leverage Group, Leverage Option
Management Co., Inc., North American
Financial, Philip Barry LLC, and Philip
Barry,
                        Defendants.
----------------------------------------X
Carl Gambello, Carole Gambello, and
Adele Disarmato,                              CV-08-3129(CPS)(SMG)
                        Plaintiffs,


          - against -


The Leverage Group, Leverage Option
Management Co., Inc., Leverage Management

LLC, North American Financial, Philip
Barry LLC, and Philip Barry,
                              Defendants.
----------------------------------------X

SIFTON, Senior Judge.

Plaintiffs Frances Monteleone ("Monteleone"), Margaret
Shaefer Barglow ("Barglow"), Carl Gambello ("Gambello") and Gene
Bianco ("Bianco"), among others (collectively, "plaintiffs"),
each commenced an action against defendants the Leverage Group
("Leverage Group"), Leverage Option Management Co., Inc.
("Leverage Option Management"), North American Financial ("North
American"), Philip Barry, LLC ("Barry, LLC") and Philip Barry
("Barry") (collectively, "defendants"), alleging that defendants
are in breach of their investment contract, have breached their
duty of good faith and fair dealing, and have engaged in
misrepresentation.  Presently before this Court is each
plaintiff's emergency motion to attach certain assets belonging
to the defendants.  For the reasons set forth below, the motions
are granted.

## Background

The following facts are drawn from plaintiffs' complaints
and submissions in support of their motion to attach.  Defendants
do not dispute any of the facts alleged by the plaintiffs.

*The Defendants*

Defendant Barry is a citizen of New York and resides in
Brooklyn, New York.  Defendant The Leverage Group is an

unincorporated business entity with its place of business also at 477 82nd street, Brooklyn, New York. Defendant Leverage Option Management Co., Inc., is a New York state business corporation with its place of business at 477 82nd street, Brooklyn, New York. Defendant Leverage Management LLC is a New York State limited liability corporation with its place of business at 477 82nd street, Brooklyn, New York. Defendant North American Financial is an unincorporated business entity with its place of business at 477 82nd street, Brooklyn, New York. And, defendant Philip Barry LLC is a New York state limited liability corporation with its place of business at 477 82nd street, Brooklyn, New York. Defendant Barry is the sole owner, officer and shareholder of Leverage Option Management Co., Inc., Leverage Management LLC and Philip Barry LLC. Defendant is also the sole owner of The Leverage Group and of North American Financial (which is an alias of The Leverage Group).

*The Monteleone Plaintiffs*

Plaintiffs are individual citizens of New Jersey, Minnesota and Tennessee. In late 2002, plaintiff Monteleone was referred to Philip Barry to invest her money with him and his companies, the Leverage Group, Leverage Option Management, North American, and Barry, LLC. Complaint filed by Monteleone et al. on May 14, 2008 ("Monteleone Compl."), ¶ 13. Defendant Barry represented that plaintiff Monteleone would receive an interest rate of

12.55% on any investment made with him.  *Id.* ¶ 14.  Plaintiff Monteleone opened an account with the Leverage Group in October 2002 by making an initial deposit of $15,000.  *Id.* ¶ 15.  She was assigned account number 10-252-02.  *Id.*  Thereafter, she received quarterly statements, which also indicated that she would receive 12.55% interest on her investment.  *Id.* ¶¶ 14, 16-17.  In December, 2007, plaintiff Monteleone received a letter from defendants saying, "[w]e will soon enter our 30th year with one of the most consistent records in the investment management business.  We look forward to again earning for you: 12.55% minimum effective annual yield for calendar year 2008."  *Id.* ¶ 19.  On January 18, 2008, plaintiff Monteleone sent a letter to defendants requesting that all of her funds from account number 10-252-02, totaling $382,967.46 as of December 31, 2007, be returned to her immediately.  *Id.* ¶ 20.  Defendants refused to return her funds.  *Id.* ¶ 21.

In April, 2003, plaintiff Scileppi invested $3000 with defendants and was assigned account number 4-182-03.  *Id.* ¶ 22.  She received a confirmation of her deposit on April 18, 2003.  *Id.*  By September 30, 2007, Scileppi's account contained $5075.57.  *Id.* ¶ 23.

Plaintiffs Frank and Wendy Monteleone opened their account with the leverage group on in June, 2003, buy making a deposit of $20,000.  *Id.* ¶ 24.  They were assigned account number 6-062-03.

*Id.* They received a statement in June, 2003, from the defendants stating that their account would earn a minimum effective annual yield of 12.55% for calendar year 2003. *Id.* ¶ 25. By December 31, 2007, their account had a balance of $137,410.06. *Id.* ¶ 26. Frank and Wendy Monteleone opened up an account for their son, Frank D. Monteleone, and an account for their daughter, Lila E. Monteleone. *Id.* ¶ 27. Both children are minors. *Id.* By December 31, 2007, Frank D.'s account, account number 3-011-01, had a balance of $18,870.69, and Lila's account, account number 10-251-02, had a balance of $18,740.32. *Id.* ¶ 28.

Plaintiff Rodriguez also opened an account with the defendants. By December 31, 2007, her account, account number 7-012-02, had a balance of $4,736.14. *Id.* ¶ 29.

*The Gambello Plaintiffs*

Plaintiffs Carl and Carole Gambello are citizens of New York. Plaintiff Disarmato is a citizen of Florida. In February of 1996, Plaintiff Disarmato spoke with defendant Barry on the phone and then mailed defendant Barry a check in the amount of $1000 to open an account in The Leverage Group. Complaint filed by Gambello et al. on July 31, 2008 ("Gambello Compl.") ¶ 46. Defendant Barry mailed Ms. Disarmato a contract signed by defendant Barry as President, which said that she would earn a minimum effective annual yield of 12.55%, which would be guaranteed for the year 1996. *Id.* ¶¶ 46, 47. The contract also

stated that she would receive quarterly statements, and was assigned account number 2-221-96. *Id.* Ms. Disarmato understood from the contract and her discussion with defendant Barry that, among other things, she would have an individual account in The Leverage Group and would be able to withdraw her money upon request. *Id.* ¶ 48. She received quarterly statements from March, 1996, through December, 2007. *Id.* ¶ 49. The statements reflected that her investment in The Leverage Group was yielding the guaranteed 12.55% annual return and that her investment was growing accordingly, as investment gains were reinvested in her account. *Id.* ¶ 49. Ms. Disarmato made $8,700 in additional investment deposits by personal check made payable to Leverage Option Management. *Id.* ¶ 50. As of March 31, 2008, her account had a balance of $10,904.32. *Id.* ¶ 51.

In July of 2002, plaintiff Carl Gambello, Ms. Disarmato's son in law, met with defendant Barry to discuss investing his money with defendant Barry and his companies. *Id.* ¶ 28. Defendant Barry represented that a minimum return of 12.55% interest on his investment was "guaranteed." *Id.* On July 8, 2002, Mr. Gambello opened an account, writing a check to the order of Leverage Option Management in the amount of $50,000, and was assigned account number 7-081-02. *Id.* ¶ 29. In return, defendant Barry gave Mr. Gambello a contract which stated that Mr. Gambello would receive a minimum effective annual yield of

12.55% on his investment and that statements of his account would be issued quarterly. *Id*. ¶ 30. Beginning with the quarter ending September 30, 2002, and continuing for every quarter thereafter until the end of 2007, Mr. Gambello received statements which stated that his investment was earning the guaranteed 12.55% annual yield, and that his investment was growing accordingly, as his investment gains were being reinvested in his account. *Id*. ¶ 34. In January, 2006, Mr. Gambello began receiving his investment gains in the form of payments by quarterly checks. *Id*. Mr. Gambello made numerous deposits with the defendants, making checks payable to the order of either Leverage Option Management or the The Leverage Group, totaling $500,000 by January 30, 2006. *Id*. ¶ 35.

On March 16, 2004, Mrs. Gambello, Ms. Disarmato's daughter, opened an account with the defendants by giving defendant Barry a check for $10,000 payable to the order of The Leverage Group. *Id*. ¶ 39. She received a contract, signed by defendant Barry as President, which said that she would earn a minimum effective annual yield of 12.55%, which would be guaranteed for the year 2004. *Id*. ¶ 40. The contract also stated that she would receive quarterly statements, and was assigned account number 3-161-04. *Id*. Mrs. Gambello made $65,000 in additional investment deposits by personal check made payable to Leverage Option Management. *Id*. ¶ 43. As of March 31, 2008, her account had a balance of

$97,207.07.  *Id*. ¶ 44.

In December 2007 or January 2008, investment checks issued by defendants to Carl Gambello, drawn on the account of Leverage Management LLC in the amount of $12,600 were returned as unpaid. *Id*. ¶ 52.  Mr. Gambello met with defendant Barry to liquidate his account.  *Id*. ¶ 53.  Defendant Barry told Mr. Gambello that he could not liquidate his account at that time.  *Id*.  Defendant Barry told Mr. Gambello that the checks bounced because The Leverage Group moved its checking account to a new bank.  *Id*.

In February, 2008, Mrs. Gambello found out that Ms. Disarmato had not received her quarterly check from the defendants.  *Id*. ¶ 54.  Mrs. Gambello phoned Mr. Barry and demanded the quarterly check and $3000, partial withdrawal from Ms. Disarmato's account.  *Id*.  Defendant Barry stated he was involved in tax time and he would soon provide the checks.  *Id*. The investment gain check, in the amount of $417.13 was eventually sent, but bounced.  *Id*. ¶¶ 56, 63.  On June 6, 2008, Mr. and Mrs. Gambello met with defendant Barry and requested a return of their funds and the funds of Ms. Disarmato.  *Id*. ¶ 59. Defendant Barry told them that he was not able to return their monies until a real estate venture of his in Sullivan County, New York, was allowed to go forward by local authorities.[1]  *Id*.  On

---

[1] Defendant Barry initially told the Gambellos that he was going to subdivide and sell these properties for cash, but that the subdivision and sales were being held up by local authorities because a bald eagle's nest was found on the property.  Then, he claimed that the subdivision and sale was

July 18, 2008, the Gambellos again met with defendant Barry to demand withdrawal of their accounts and Ms. Disarmato's account. *Id.* ¶ 60.  Defendant Barry told them that their money was not available and would not become available for approximately four months.  *Id.*  Defendant Barry refused to show the Gambellos any documentation concerning how the money was invested.  *Id.*  He acknowledged that he had recently purchased the building in which his office was located.  *Id.*

*The Bianco Plaintiffs*

In March of 2005, plaintiff Gene Bianco, a Vermont resident, and his mother, Anita Bianco, a California resident, were referred to defendant Barry to invest their money with him and his companies.  Complaint filed by Bianco et al. on July 23, 2008 ("Bianco Compl."), ¶ 10.  As with plaintiffs Moneteleone and Gambello, defendant Barry represented to plaintiff Bianco that he and his mother would receive interest at a rate of 12.55% on their investment.  *Id.* ¶ 11.  Plaintiff Bianco and his mother opened two accounts with the Leverage Group, and thereafter, they received quarterly statements indicating that they would receive a 12.55% rate of return on their investments.  *Id.* ¶¶ 12-15.  In March, 2005, they deposited $10,000 into the first joint account, account number 2-101-05.  *Id.* ¶ 12.  They subsequently deposited

---

being held up because he found natural gas deposits on the properties and that
he would soon start receiving royalty fees from gas companies for leasing the
land.  Barry estimated that in four months he would be able to give the
Gambello plaintiffs their monies.

more money into this account and by December 31, 2007, the account had a balance of $295,595.56. *Id.* ¶ 13. In October, 2006, they deposited $30,500 into a second joint account, account number 10-232-06. *Id.* ¶ 14. More money was subsequently deposited into this account, and as of March 31, 2008, this account had a balance of $53,673.34. *Id.* ¶ 15. Only July 16, 2008, counsel for Gene and Anita Bianco sent a letter to the defendants requesting that all of their funds from account numbers 2-101-05 and 10-232-06 , totaling $349,268.90 as of July 16, 2008, be returned to them immediately. *Id.* ¶ 16. Defendants refused to return plaintiff Bianco's funds as requested. *Id.* ¶ 17.

*The Barglow Plaintiffs*

Plaintiffs are all individual citizens of California. In February 2008, plaintiff Barglow was referred to defendant Barry to invest her money with him and his companies. Complaint filed by Barglow et al. on May 27, 2008 ("Barglow Compl."), ¶ 15. As with the other plaintiffs, defendant Barry represented to plaintiff Barglow that she would receive interest at a rate of 12.55% on her investment. *Id.* ¶ 16. Plaintiff Barglow opened her account, account number 2-061-08, with the Leverage Group in February 2008 by making a deposit of $50,000. *Id.* ¶ 17. Thereafter, she received a letter dated February 6, 2008 from defendant Barry, indicating that her opening deposit had been

received and that she would receive interest at a rate of 12.55% on her investment. *Id.* Plaintiff Barglow made a second deposit of $50,000 in April of 2008, and received an acknowledgment email from defendant Barry in response. *Id.* ¶ 18.

On May 19, 2008, upon learning of other legal action involving the defendants, plaintiff Barglow send a letter via both Federal Express and email to defendants formally requesting that all of her funds on record with defendants be returned to her by May 22, 2008. *Id.* ¶ 19. Defendants refused to return plaintiff Barglow's funds to her as requested. *Id.* ¶ 20.

In February, 2008, Ms. Barglow's brother in law, Raymond Barglow, and his wife, Ms. Montanaro, opened an account with The Leverage Group, account 2-201-08, with an initial deposit of $50,010. *Id.* ¶ 21. As with other plaintiffs, defendant Barry represented that the monies in account 2-201-08 would receive a minimum yearly interest rate of 12.55%. *Id.* ¶ 22. They made an addition deposit in the amount of $100,000 to their account on April 15, 2008. *Id.* ¶ 24. On May 16, 2008, Mr. Barglow and Ms. Montanaro sent a fax and email to the defendant requesting a return of all their funds by May 19, 2008. *Id.* ¶ 25. Defendants refused to return Mr. Barglow's and Ms. Montanaro 's funds as requested. *Id.* ¶ 27.

Plaintiffs Siri Scull, Charles Scull, Robert Wolfson and Mahalia Pugatch allege facts similar those recited by the other

-12-

plaintiffs in the Barglow and other actions. Each plaintiff alleges that he or she deposited funds with defendant Barry and his companies, for which they were promised a 12.55% rate of return and the provision of quarterly statements. The plaintiffs were told that they could withdraw their money at any time. When the plaintiffs eventually requested that their funds be returned, however, defendants refused to return them. None of the plaintiffs has received a quarterly statement since December of 2007. Barglow Compl. ¶¶ 21-45, 47, 63.

*Procedural History*

Plaintiffs initiated these actions in May and July of 2008. The Gambello case was initially assigned to Judge Garaufis. Defendant Barry refused to identify how the plaintiffs' money was invested or where it currently is. Hearing before Judge Garaufis, August 1, 2008, pp. 8-18. On August 1, 2008, Judge Garaufis issued a temporary restraining order ("TRO") enjoining all the defendants from "directly or indirectly transferring, secreting, encumbering, or otherwise disposing" of any personal or real property or assets or the proceeds of the sale of the assets. *Id*. at pp. 19-20. Judge Garaufis also told defendant Barry to secure counsel. *Id*. at p. 9. On August 8, Judge Garaufis extended the TRO until August 18, 2008. On August 8, the case was reassigned to Judge Mauskopf.

On August 11, 2008 Judge Mauskopf held a hearing to

determine whether a preliminary injunction should be issued.
Judge Mauskopf issued a preliminary injunction in the Gambello,
Barglow and Monteleone cases enjoining defendants from
transferring or otherwise disposing of any of their assets
without an order of the Court and ordered expedited discovery.
Judge Mauskopf also found that attachment is necessary if the
property could be appropriately identified.  Hearing before Judge
Mauskopf, August 11, 2008, p. 47.  Judge Mauskopf concluded that
plaintiffs' had shown a strong likelihood of success on the
merits.  *Id*. at p.48.  She found that plaintiffs' complaints show
a pattern of misrepresentation and that the defendants owe them
money.  *Id*.

Judge Mauskopf found as a basis for her conclusions a
pattern of misrepresentation because defendant Barry transferred
real property that he purchased from himself to a new entity,
Philip Barry LLC, and because the money in all three actions was
unaccounted for even after repeated demands for the money or for
an accounting of the money.  *Id*. at p. 49.  Judge Mauskopf found
that there was a risk of continued dissipation of assets because
of evidence that the investors' money had been used to purchase a
building in Kings County that is the defendants' place of
business, and to maintain that property by using investors' money
to make mortgage payments, and to pay for defendant Barry's
personal expenses.  *Id*. at p. 49, 50.  She also found that it was

likely that plaintiffs' money was used to purchase or maintain
some of the properties the transfer of which were enjoined in
Sullivan County, New York. *Id*. Plaintiffs' also showed that
defendants have no other way of making the plaintiffs whole and
that defendant's insolvency was probable. *Id*. Defendant Barry
has conceded he does not have the assets outside the real
property sought to be restrained or attached to satisfy
plaintiff's demands. *Id*. at pp. 49-50.

Also on that date, Judge Mauskopf directed the parties to
engage in expedited discovery, in the Gambello action, to aid in
plaintiffs' preparation of applications for orders of attachment,
specifically to enable plaintiff's to identify the real property
they were seeking to attach. *Id*. at 53. With defendants'
consent, the preliminary injunction was extended on August 26,
2008. *Id*. at 51.

On August 25, 2008, the parties again appeared before Judge
Mauskopf. Judge Mauskopf again denied plaintiffs' application
for an order of attachment without prejudice to its renewal on or
before September 16, 2008. Judge Mauskopf ordered that the
information received from the defendants in expedited discovery
be given to the plaintiffs in the Bianco, Monteleone and Barglow
actions. On September 10, 2008, these cases were reassigned to
the undersigned. On September 16, 2008, plaintiffs renewed their
motion for attachment, this time presenting a detailed list of

-15-

properties to be attached based on the information received during expedited discovery.

## Discussion

Plaintiffs request an order of attachment, pursuant to Rule 64 of the Federal Rules of Civil Procedure and N.Y. C.P.L.R. § 6201 ("§ 6201"), directing levy upon the identified real and personal property within defendants' ownership, possession, custody, or control.  Under Rule 64, attachment is available in the manner provided by the law of the state in which the district court is held.  *See* Fed.R.Civ.P. 64.[2]  New York law requires that plaintiffs seeking attachment must show by affidavit (1) that there is a cause of action, (2) that there is a probability of success on the merits, (3) that a ground for attachment listed in § 6201 exists, and (4) that the amount demanded from defendants exceeds all counterclaims known to plaintiffs. *See* N.Y. C.P.L.R. § 6212(a) ("§ 6212(a)").

Prejudgment attachment is a provisional remedy to secure a debt by preliminary levy upon the property of the debtor in order to conserve that property for eventual execution.  Because

---

[2]  A question was raised at oral argument regarding my authority to issue an attachment in Sullivan Co., New York.  Under Fed.R.Civ.Pro. 64, attachment is available in the manner provided by the law of the state in which the district court is held.  *See* Fed.R.Civ.Pro. 64.  Under New York law, an order of attachment "shall be directed to the sheriff of any county or of the city of New York where any property in which the defendant has an interest is located or where a garnishee may be served."  N.Y. C.P.L.R. § 6211.  A judge ordering an attachment need not be sitting in the county where the attachment is to be enforced.  *See id.*

attachment is a harsh remedy, the statute must be strictly
construed in favor of those against whom it may be applied.  *See*
*Michaels Elec. Supply Corp. v. Trott Elec. Inc.*, 231 A.D.2d 695
(2d Dep't 1996); *P.T. Wanderer Assoc., Inc. v. Talcott*
*Communications, Corp.*, 111 A.D.2d 55 (1st Dep't 1985).  Moreover,
the granting of prejudgment attachments is discretionary, "'and
even when the statutory requisites are met, the order may be
denied.'"  *Elliott Assoc., L.P. v. Republic of Peru,* 948 F. Supp.
1203, 1211 (S.D.N.Y. 1996) (quoting *Filmtrucks, Inc. v. Earls*,
635 F. Supp. 1158, 1162 (S.D.N.Y. 1986)).

   As to the first and second requirements of § 6212(a), that a
cause of action exists and that the movant is likely to succeed
on the merits, "the court must give the plaintiff the benefit of
all the legitimate inferences that can be drawn from the facts."
*Bank Leumi Trust Co. v. ISTIM, Inc., et al.*, 892 F.Supp. 478,
481-82 (S.D.N.Y. 1995)("*Bank Leumi*")(quoting *National Bank &*
*Trust Co. v. J.L.M. International, Inc.*, 421 F.Supp. 1269, 1272
(S.D.N.Y. 1976)).  As was found by Judge Mauskopf,[3] plaintiffs
have presented sufficient evidence by affidavits and other
written evidence that they deposited investment funds with

---

[3]Judge Mauskopf's findings in this matter are the law of the case and
will be followed by this Court.  *See Marfia v. T.C. Ziraat Bankasi*, 100 F.3d
243, 251 (2d Cir. 1996)(a judge's ruling constitutes the law of the case even
after re assignment to a second judge); *Playboy Enterprises, Inc. v. Dumas*,
960 F.Supp. 710, 716-17 (S.D.N.Y. 1997)("the unreversed factual findings and
legal conclusions of another court in he same case should not be disturbed
absent changed law, changed circumstances, or clear error.").

defendants that have not been returned upon request as required by contract and that are currently unaccounted for. Mauskopf Hearing at 49. Plaintiffs have also presented evidence that defendants have engaged in systematic misrepresentation regarding the nature of the investment and the status of the investment monies when inquiries were made. *Id.* at 48. Judge Mauskopf found that plaintiffs had shown a strong liklihood of success on the merits. *Id.* Thus, plaintiffs have fulfilled the first two requirements of § 6212(a).

Plaintiffs have also satisfied the fourth requirement that the amount demanded from the defendant exceeds all counterclaims known to the plaintiff. Defendants have stated a number of counterclaims, none of which pertain to damages. Defendants argue that "third-party defendants are certain to assert counterclaims which will... exceed the amount(s) demanded by the plaintiff in this action." Defendants' Memorandum of Law in Opposition to Plaintiffs' Motions for Attachment at 15. However, defendant's speculation regarding what counterclaims may be filed in the future is irrelevant to the question of what counterclaims are 'known to plaintiff' at the current time.

Because the first, second, and fourth requirements of the statute are met, the motion for attachment turns on the third requirement, whether plaintiffs have established grounds for attachment. To establish the relevant grounds for attachment,

plaintiffs (a) must be seeking a money judgment, and (b) must show that defendants, "with intent to defraud creditors or frustrate enforcement of a judgment that might be rendered in plaintiffs' favor, [have] assigned, disposed of, encumbered or secreted property, or removed it from the state or [are] about to do any of these acts." § 6201(3).

In this case, plaintiffs have demonstrated that adequate grounds exist for attachment. First, the complaints seek, *inter alia*, money judgments. Second, plaintiffs have demonstrated that defendants, with intent to both defraud creditors and frustrate enforcement of a judgment, have disposed of or dissipated their assets and real property and intend to continue to do so.

(a) *Disposal of assets*

Under the plain meaning of the statute, there are grounds for attachment when there is a showing of either past disposal or imminent future disposal of assets. Plaintiffs need not show actual proof of disposition or secretion of property. 7A Weinstein-Korn-Miller, *New York Civil Practice P* 6201.12 (1994 ed.). It is enough to show the transfer or disappearance of an abnormal amount of property, although the burden is on the plaintiff to show that the defendant has begun removing its assets. *Bank Leumi*, 892 F.Supp. at 482. Judge Mauskopf found that the money belonging to plaintiffs are unaccounted for even

after repeated requests by plaintiffs. *Id.* at 49. Judge
Mauskopf also found evidence that the money has been used to buy
the building in Kings County that is the defendants' place of
business, and that in all likelihood, plaintiffs' money was used
to purchase or maintain some of the properties that are being
sought to be attached. *Id.* Bank statements also show that Barry
used the accounts into which he directed the investors to deposit
funds to make payments on various mortgages and also of his
personal living statements. P. Motion to Attach at 9-12.
Furthermore, Judge Mauskopf found that Barry had made several
unexplained transfers of real property to Philip Barry LLC. *Id.*
at 50. Defendants have thus dissipated investor funds and
thereby disposed of property within the meaning of § 6201(3).
Defendants do not dispute this evidence of past disposal.

In addition, Barry has since asserted his Fifth Amendment
right of self incrimination with regard to acts of past asset
dissipation and with regard to whether he was obeying the
preliminary injunction order not to transfer assets in the
future. Scarvalone Dec. Ex. S at 14-21 and 158-59. A Court may
draw an adverse inference against a party in a civil action when
a party invokes his Fifth Amendment right and refuses to testify
in response to probative evidence offered against him. *See*
*Baxter v. Palmigiano*, 425 U.S. 308, 318, 47 L. Ed. 2d 810, 96 S.
Ct. 1551 (1976); *Brink's, Inc. v. New York*, 717 F.2d 700, 709

(1983). With regards to what weight to accord an adverse
inference, the Second Circuit has stated that "[s]ilence is often
evidence of the most persuasive character." *Libutti v. U.S.*, 107
F.3d 110, 121 (2d Cir. 1997). However, the invocation of the
Fifth Amendment cannot be the sole basis upon which a significant
penalty is leveled against the party remaining silent. Rockwood
Computer Corp. v. Morris, 94 F.R.D. 64, 67 (E.D.N.Y.
1982)(declining to grant summary judgment on the basis of the
invocation of the Fifth Amendment privilege alone, because that
would "impose a significant cost for the defendant's silence, and
as such would run afoul of the constitutional protection.") In
this case, there is ample evidence of asset dissipation unrelated
to Barry's Fifth Amendment invocations. Therefore, it is
permitted to draw an adverse inference from his failure to
respond when asked about dissipation.

Based on these facts, there is evidence to support a finding
that defendants disposed of property within the meaning of §
6201(3).


(b) *Intent to Defraud*

Assignment or disposition of property is not a sufficient
ground for attachment; fraudulent intent must be proven." *Abacus
Federal Sav. Bank v. Lim*, 8 A.D.3d 12, 13, 778 N.Y.S.2d 145 (1st
Dept. 2004). The existence of an actual intent to defraud is

never presumed, and intent cannot be inferred lightly. *See Brastex Corp. v. Allen Int'l, Inc*., 702 F.2d 326 (2d Cir.1983); *Signal Capital Corporation v. Frank*, 895 F.Supp. 62, 64 (S.D.N.Y.1995). The moving papers must contain facts proving the fraud and not simply conclusions. *See Anderson v. Malley*, 191 App.Div. 573, 181 N.Y.S. 729 (1st Dept. 1920)(cited in *Encore Credit Corp v. LaMattina et al*., 2006 U.S. Dist. LEXIS 2935 * 9 (E.D.N.Y. 2006). Affidavits containing allegations raising a mere suspicion of an intent to defraud are insufficient. *Rosenthal v. Rochester Button Co*., 148 A.D.2d 375, 539 N.Y.S.2d 11 (1st Dept. 1989).

"It is not always practicable to establish by proof the existence of a fraudulent intent ... even when in reality it exists. Direct proof of the fact can rarely be obtained, and when it is established it must ordinarily be inferred from the circumstances." *Bank Leumi*, 892 F.Supp. at 483 (citation omitted). *See also In re Kaiser*, 722 F.2d 1574, 1582 (2d Cir. 1983) ("[f]raudulent intent is rarely susceptible to direct proof."). In this case, there is strong proof that defendants induced plaintiffs into giving defendants money with false promises. When plaintiffs became suspicious and sought return of their money, defendants refused. Defendants offered changing stories for why the money could not be delivered, and wrote plaintiffs checks that bounced. Defendants have refused to

-22-

identify the money and how it was invested. These facts support
a finding of intent to defraud.

In addition to the fraud perpetrated on the plaintiffs with
regards to their investment accounts, there is also the issue of
defendants' intent to defraud plaintiffs by transferring the
properties from defendant Barry to Philip Barry, LLC. Courts
have identified certain "badges of fraud" that give rise to an
inference of an intent to defraud with regards to a real estate
transfer. *Lippe v. Bairnco Corp.*, 249 F.Supp.2d 357, 375
(S.D.N.Y. 2003)(quoting *BFP v. Resolution Trust Corp.*, 511 U.S.
531, 541, 114 S. Ct. 1757 (1994)). Among these 'badges' are:
"(1) gross inadequacy of consideration; (2) a close relationship
between transferor and transferee; (3) the transferor's
insolvency as a result of the conveyance; (4) a questionable
transfer not in the ordinary course of business; (5) secrecy of
the transfer; and (6) retention of control of the property by the
transferor after the conveyance." *Lippe*, 249 F.Supp.2d at 375,
citing *BFP*, 511 U.S. at 541. Many of these 'badges' are present
in this case. First, Barry transferred properties to Philip
Barry, LLC, for grossly inadequate consideration of $10.
Plaintiff Monteleone's Statement of Material Facts ¶ 26, 31 ("P.
Monteleone SMF"). Second, Barry transferred properties to Barry
LLC, of which he is the sole member, which is a close
relationship. Third, Judge Mauskopf found that defendants have

no other way of making the plaintiffs whole other than by means
of these properties and that insolvency is a real possibility.
Mauskopf Hearing at 48. Fourth, the transfer of assets from
defendant Barry to Barry, LLC was questionable[4] and resulted in a
retention of control of the properties by Barry.

Defendants cite *Merrill Lynch*, 585 F.Supp. 1245, 1258
(S.D.N.Y. 1984), where the Court declined to infer fraud from a
defendant's failure to account wholly for allegedly stolen funds
to investigators, because defendant was under no duty to do so,
she did account for over half of it, and she stated a legitimate
motive for moving money from her own account to that of her
husband. That case has no bearing here, where defendants were
under a duty to account for the money according to their contract
with investors, defendants have been unable to account for any of
the money, and defendants have put forth no legitimate motive for
spending the money on real estate transactions and personal costs
rather than investing it as promised.


(c) *Reverse veil piercing*

Properties subject to the attachment include both those
attributable to Barry individually and to his privately held

---

[4]In his unsworn testimony before Judge Mauskopf, Barry claimed that the
transfer of the properties was effected at the request of the mortgagees, who
wanted a separate, sole purpose entity for the mortgage. Defendants have not
restated this explanation in their moving papers, nor have they provided any
affidavits that indicate that this was the reason for the transfer. As such,
the transfer remains questionable for the purposes of this motion.

entities, Philip Barry, LLC and Leverage Management, LLC, which have no business purpose or holdings other than the real property Plaintiffs seek to attach. Mauskopf Hearing at 24-25, cited in P. Monteleone SMF at ¶ 103. The companies are wholly owned by Barry, and plaintiffs can attach the companies themselves as property within defendants' ownership, possession, custody, or control. See § 6201. Second, plaintiffs can attach the real estate owned by these companies because plaintiffs have made a showing sufficient to disregard the corporate form. Under New York law, "a plaintiff seeking to pierce the corporate veil must prove both complete domination and that the domination was used to commit a fraud with respect to the transaction at issue." *Mars Electronics of N.Y., Inc. v. U.S.A. Direct, Inc*., 28 F.Supp.2d 91, 97 (E.D.N.Y.1998); see also *American Fuel Corp. v. Utah Energy Dev. Co.*, 122 F.3d 130 (2d Cir.1997) (stating that in order to pierce the corporate veil, plaintiff must plead and prove both domination "and that such domination was used to commit a fraud or wrong that injured the party seeking to pierce the veil"). Piercing analysis is typically used to hold individuals liable for the actions of a corporation that they control. *See American Fuel Corp. v. Utah Energy Dev. Co.*, 122 F.3d 130, 133 (2d Cir.1997). New York law, however, also recognizes "reverse piercing," which seeks to hold a corporation accountable for actions of its shareholders. *See id*. Defendant

Barry does not dispute that he completely dominates these companies as the sole shareholder and the only officer and director. Barry has used the corporate form to perpetrate a fraud that injured plaintiffs. In addition, Barry has transferred assets from himself to Philip Barry, LLC.

(c) *Defendants' disavowal of rights to the properties*

Defendants state that they have "disclaimed any interest in the Real Property" and that they "acknowledge that the Real Property should be managed and/or liquidated for the benefit of all investors and creditors of the Leverage Group Entities, and not just for the benefit of plaintiffs herein." D. Opp. at 12. It is not clear what legal effect the defendants hope to create with this statement. Defendants appear to be resisting attachment on the ground that it will prejudice the interests of future as yet unknown plaintiffs in actions against them. Defendants cite no case, and this court is aware of none, in which an attachment was denied because of priority. Moreover, the argument that courts should deny an attachment because it would give priority over future plaintiffs, is nonsensical. It would mean that an attachment could never be ordered in a case where the defendant could point to other victims or creditors who had not yet filed suit. In addition, attachment would protect other investors rights by preserving the assets that could be

used to pay other judgments against the defendants. The fact that defendants have disclaimed their interests in the property weighs heavily in favor of granting the attachment. Defendants cannot claim that attachment is a "harsh remedy" in this case if they do not claim an interest in the property.

Defendants argue the preliminary injunction makes attachment redundant, since it is sufficient to protect plaintiffs' interest in the land pending resolution of this action. D. Opp. at 11. However, when questioned about whether any of the defendants had made transfers of property in violation of the temporary restraining order, or whether Barry had violated the restraining order by making the monthly mortgage payments on the building where the defendants' offices are located, Barry asserted his Fifth Amendment privilege instead of answering. Scarvalone Dec. Ex. S at 158-59 and 346-48. An adverse inference that Barry has in fact violated the preliminary injunction or is intending to do so is warranted. Defendants point to the fact that Judge Mauskopf declined to order attachment of the properties. However, Judge Mauskopf in fact found that attachment would be necessary, and declined to issue the order of attachment only because the plaintiffs had not properly identified the properties. Mauskopf hearing at 47, 54, 56. These properties have now been identified and are appropriate for attachment. An order of attachment is warranted in this case.

## Conclusion

For the reasons set forth herein, plaintiffs' emergency motion to attach certain assets belonging to the defendants is granted. The Clerk is directed to transmit a copy of the within to all parties and the assigned Magistrate Judge.


SO ORDERED.


Dated :    Brooklyn, New York
           October 7, 2008

                    By: /s/ Charles P. Sifton (electronically signed)
                        United States District Judge